**UNITED STATES DISTRICT COURT**
**MIDDLE DISRICT OF GEORGIA**
**VALDOSTA DIVISION**

| | |
|---|---|
| **GINA LOVE, et al.,** | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 7:08-cv-62 (HL)** |
| **TIFT COUNTY, GEORGIA, et al.,** | |
| **Defendants.** | |

## ORDER

Before the Court is Defendants' Motion for Summary Judgment (Doc. 54), Plaintiffs' Motion for Leave to File Insurance Policy (Doc. 115), and Plaintiffs' Request for Oral Argument (Doc. 116).  For the following reasons, Defendants' motion is granted and Plaintiffs' Request for Oral Argument is denied.  The Plaintiffs' Motion for Leave to File Insurance Policy is denied as moot.

**I.    BACKGROUND**

Plaintiffs are Jean Smith and Gina Love, personal representative of the estate of decedent Luther Franklin Smith, Jr. ("Smith").  They filed their complaint for damages against Defendant Tift County Sheriff Gary Vowell ("the Sheriff") in his official capacity and Tift County, Georgia ("the County"). Plaintiffs allege that Smith's Fourteenth Amendment rights were violated while he was a pretrial

detainee at the Tift County Jail ("the jail").   The complaint also alleges a pendant state law claim.

Plaintiffs contend that the Defendants knew of problems in the delivery of medical care to pretrial detainees housed at the jail and they failed to correct them. The problems included low staffing levels, lack of basic medical supplies and working equipment, medical treatment provided by unqualified personnel, and delays in treating pretrial detainees and transferring them to outside medical facilities.   The Plaintiffs also contend that the Defendants failed to train patrol and jail officers to recognize stroke symptoms or to recognize that a person may suffer from a medical condition though appearing to be impaired by drugs or alcohol. According to Plaintiffs, these problems violated Smith's constitutional rights because Smith received delayed medical care for treatment of a stroke he suffered soon before he was taken into police custody.

On May 13, 2008, Plaintiffs filed their complaint alleging violations of 42 U.S.C. § 1983 and § 1988 (Doc. 1).   On July 21, 2009, Defendants filed a motion for summary judgment (Doc. 54).   They argue that they are entitled to judgment as a matter of law as to all claims raised in Plaintiffs' complaint.

The Court has reviewed the motion and briefs of the parties and determines that it can resolve the Motion for Summary Judgment without the assistance of oral argument.   The Plaintiffs' Motion for Oral Argument (Doc. 116) is therefore denied.

## II.    FACTUAL BACKGROUND

### a.  The Traffic Stop

Around 10:20 am on May 14, 2006, Smith was traveling southbound on Interstate 75 in his commercial truck when he was pulled over by Deputy Joey Budd ("Budd") of the Tift County Sheriff's Office.   Budd stopped Smith after having observed smoke billowing from Smith's truck.  (SOMF ¶ 1).[1]  While driving behind Smith, Budd called 911 and the fire department to report that Smith's truck seemed to be on fire.  (SOMF ¶ 2).

After Smith stopped his truck and pulled over to the side of the interstate, Budd approached Smith.  (SOMF ¶ 4).  Budd asked Smith if everything was alright.  He explained to Smith that smoke was emitting from Smith's truck.  (SOMF ¶ 4).  Smith stated that he wondered why other drivers honked at him and pointed to his truck. (SOMF ¶ 4).

Budd noticed that Smith was unsteady on his feet, that his speech was slow and kind of mumbled, that his shoes were on the wrong feet, and that he had urinated in his pants. (SOMF ¶ 5; Budd Dep. at 45).   Budd could not remember all the questions he asked Smith, but Budd testified that he probably asked Smith "the normal stuff," like whether Smith had a license and insurance.  (Budd Dep. at 46). Smith answered Budd's questions and provided Budd his driver's license. (Budd Dep. at 44, 47).

---

[1] "SOMF" refers to the Defendants' Statement of Material Facts.  The cited paragraphs are those admitted by Plaintiffs in their response to Defendants' Statement of Material Facts.

At some point Budd instructed Smith to sit down on the ground because Smith was unsteady on his feet.  (Budd Dep. at 65).  Budd often asked impaired detainees to sit because they sway and stagger a lot.  (Dep. at 65).  During his interaction with Budd, Smith never indicated that he did not feel right or that he had any medical problems.  (SOMF ¶ 18).

Budd was aware that there could be medical explanations for Smith's behavior, and he was not in a position to rule out the possibility that Smith's behavior was caused by a medical condition and not drugs.  (Budd Dep. at 75).  However, based on his knowledge, training, and experience, it appeared to Budd that Smith was under the influence of alcohol or some other type of drug.[2]  (Budd Dep. at 63).  Budd testified that drivers who drive under the influence drive at all hours of the day any day of the week, and commercial drivers are historically known for using drugs to stay awake during long drives.  (Dep. at 76).  He also testified that people who drive under the influence of drugs do not necessarily have drugs or drug paraphernalia on their persons or in their vehicles.  (Budd Dep. at 78).

Having concluded that Smith was probably under the influence of drugs, Budd contacted Deputy Mark Lyles ("Lyles") for assistance because Budd did not smell alcohol on Smith's breath and he was not specially trained to recognize whether a person was under the influence of drug other than alcohol.  (SOMF ¶ 12).  Lyles had completed specialized training to become a Drug Recognition Expert, but had not yet taken the certification test.  (Lyles Aff. ¶ 5).

---

[2] Budd had completed a twenty-four hour course on identifying drivers who drive under the influence.  (SOMF ¶ 9).

Before Lyles arrived, fire department personnel examined Smith and took his blood pressure.  (Budd Dep. at 63).  They asked Smith if he was okay or needed medical care.  (SOMF ¶ 15).  Fire Department Lieutenant Bobby Bennett testified that based on Smith's speech and lack of balance, he believed Smith was under the influence of drugs.  (SOMF ¶ 14).

Upon arriving, Lyles observed that Smith had his shoes on the wrong feet, his voice was slow and raspy, and he was unsteady on his feet.  (SOMF ¶ 27).  Lyles asked Smith whether he had any illnesses, injuries, or physical impairments.  (Lyles Dep. at 50-51).  Lyles engaged in some conversation with Smith. For example, Lyles asked Smith from where he came, whether he had anything to drink, and whether he would participate in field sobriety tests.  (Lyles Dep. Vol. I at 50-51).  To each of Lyles' questions, Smith responded in an intelligible manner, but some of his answers were mumbled.  (Lyles Dep. Vol. I at 59).  Because Smith answered all his questions coherently, Lyles did not think Smith had an injury or illness.  (Lyles Dep. Vol. II at 7).

Lyles then conducted a few field sobriety tests.  Smith did not properly perform the horizontal gaze nystagmus test and heel to toe walking test.  His failure to properly perform the tests indicated that Smith was impaired.  (SOMF ¶ 29).  During the walk and turn test, Lyles asked Smith again whether he had any medical problems and Smith said no.  (Lyles Dep. Vol. I at 53; SOMF ¶ 30).  Lyles examined Smith's eyes with pupilometer and noticed that the pupils were constricted and his eyes were glassy.  (Lyles Dep. Vol. I at 51).  The pupil

measurement indicated impairment.  (Lyles Dep. Vol. I at 63).  Fireman personnel also told Lyles that Smith's blood pressure and pulse were in normal ranges.  (Lyles Dep. Vol. I at 54).  Lyles did not see any sign that Smith had been involved in an accident, had received any trauma to any part of his body, or had a medical problem.  (Lyles Aff. ¶ 8).

Lyles arrested Smith for driving under the influence of drugs, not alcohol.  (Lyles Dep. Vol. I at 54).  Lyles requested that Smith undergo a breath, blood, and urine test while in custody.  (Lyles Dep. Vol. I at 54).  Smith agreed to take the tests. (Lyles Dep. Vol. I at 54).

### b.  Smith's Detention and Subsequent Medical Treatment

Lyles transported Smith to the jail.  (SOMF ¶ 39).  Upon arriving at the jail, Smith took a breath test.  The test measured .000 grams of alcohol in Smith's body. (SOMF ¶ 39).  Following the breath test, Lyles transported Smith to the Tift Regional Medical Center to take a blood test and provide a urine sample.  (Lyles Dep. Vol. I at 76).  Lab technician, Kandy Whitfield, collected two blood samples from Smith.  (SOMF ¶ 41).  The samples were placed in a Georgia Bureau of Investigation ("GBI") crime lab kit.  (SOMF ¶ 41).  The kit was sealed and sent to GBI for testing. (Lyles Dep. Vol. I at 77-78).  Smith was unable to perform the urine test.  (Lyles Dep. Vol. I at 65).

Kandy Whitfield testified that Smith provided her his first and last names. (SOMF ¶ 43; Whitfield Dep. at 22).  She believed Smith was drunk or high because

he was stumbling and not walking straight.  (Whitfield Dep. at 22). Whitfield had no training in clinical diagnosis of medical conditions.  (Whitfield Dep. at 17).

Lyles transported Smith back to the jail.  Lyles read Smith his Miranda warnings.  Smith stated that he did not want an attorney.  (SOMF ¶ 44).  Lyles then performed more tests on Smith as part of a drug influence evaluation. (Lyles Vol. I Dep. at 81).  Lyles was not certified to conduct a drug influence evaluation because he had not yet taken the certification test, but he had completed the training required to conduct the evaluation.  (Lyles Aff ¶ 5; Dep. Vol. I at 55).  Smith's performance on the evaluation indicated to Lyles that Smith was under the influence of a drug.  (Lyles Dep. Vol. I at 81).  Lyles issued Smith a citation for driving under the influence of drugs and operating an unsafe vehicle.  (SOMF ¶ 46).

Lyles left Smith in the custody of the County jail officers on duty.  (SOMF ¶ 47).  Lyles told the jail officers that Smith was not impaired by alcohol.  (Lyles Dep. Vol. II at 54).

Jail officer Thomas Catanzarita ("Catanzarita") performed the initial intake process on Smith.  (SOMF ¶ 49).  Pursuant to the Jail's policy, Catanzarita asked Smith questions contained on a medical questionnaire.  Catanzarita wrote down Smith's answers on an intake form.  (SOMF ¶ 50).  He also wrote down his observations about Smith's physical appearance.  (SOMF ¶ 50).  Catanzarita did not observe from Smith any signs of distress or symptoms out of the normal, but Catanzarita had no medical training. (Catanzarita Dep. at 22-23).  If Catanzarita

had seen obvious signs of distress, then he would have summoned medical attention.  (Catanzarita Dep. at 43).

Smith was unable to provide certain information, like his marital status, his nicknames, and his driver's license information.   (Catanzarita Dep. at 72).  However, Smith provided answers to Catanzarita's medical questions.  (Dep. at 18).  Since Smith could not answer certain questions, Catanzarita left portions of the intake form blank. (Catanzarita Dep. at 75).[3]

Catanzarita then placed Smith in a holding cell near the booking area. (SOMF ¶ 52).  The purpose of placing Smith in the cell was to allow him to sober up.  The jail officers customarily allowed detainees to sober up before completing the booking process.  (SOMF ¶ 55).  That way, the fingerprinting and photographing processes would occur more smoothly.  (SOMF ¶ 57). The sobering up process can take up to twelve or thirteen hours.  (SOMF ¶ 55; Catanzarita Dep. at 16).   Once the detainee had sobered up, the detainee was allowed to use the telephone. (SOMF ¶ 66).

Throughout the afternoon, Catanzarita observed Smith in his cell.   He remembers that Smith slept most of the time and occasionally used the restroom. (Catanzarita Dep. 31).   Smith was still detained in the holding cell when Catanzarita's shift ended at 6:00 p.m.  Catanzarita informed the replacement jail officers that Smith was detained in a holding cell because he was under the influence of a drug.  (SOMF ¶ 54).

---

[3]  Catanzarita had been previously disciplined for failing to follow instructions, to proof read fingerprint cards, to properly release detainees, to properly complete intake and medical forms, and for using improper language.  (Catanzarita Dep. Ex. O).

Throughout the evening Officer Casey Williamson ("Williamson") saw Smith standing and walking in his cell. (Williamson Dep. at 25). Williamson remembers that Smith asked to use the phone to call his wife. (Williamson Dep. at 25). Smith never stated that he did not feel well nor did he ask for medical care. (SOMF ¶ 66). Later that evening, the jail officers attempted to complete the booking process with Smith, but the officers found Smith was still under the influence of a drug. (SOMF ¶ 60). The officers placed Smith back in the holding cell and planned to attempt to complete the booking process later on. (SOMF ¶ 60).

Around 11:00 p.m., the jail officers were told that Smith had fallen. (SOMF ¶ 61). Upon examining Smith, Williamson noticed that Smith's face appeared to be drooping and that his mouth was emitting drool. (SOMF ¶ 62). Williamson and the other jail officers decided Smith needed medical attention. Williamson contacted the on-call jail nurse, who directed him to call emergency medical services. (Williamson Dep. at 28).

Emergency workers arrived within a few minutes after Williamson contacted them. (SOMF ¶ 64). Smith was transported to the hospital and subsequently admitted. (SOMF ¶¶ 64, 69). Medical doctors determined that Smith suffered an ischemic stroke. (SOMF ¶ 70). Test results showed that Smith's stroke affected the right hemisphere of his brain. (SOMF ¶ 73). Plaintiffs' medical expert believes Smith was suffering from a stroke at the time Budd stopped Smith's truck around 10:20 a.m. (Sanders Dep. at 58).

It can appear to lay witnesses that stroke victims are under the influence of alcohol or drugs. (SOMF ¶¶ 75, 76). Persons suffering from strokes will display symptoms of slurred speech, confusion, and unsteady balance. (SOMF ¶ 75). According to Plaintiffs' medical expert, it would not have been obvious to deputies without medical training that Smith was having a medical problem as opposed to being under the influence. (SOMF ¶ 78). Further, it is not unusual for doctors to misdiagnose stroke symptoms. (SOMF ¶ 80).

Smith later died from stroke complications. (SOMF ¶ 70). The parties' experts dispute that if Smith had been seen by a doctor earlier, whether he would have been eligible to receive t-PA, a drug that limits the severity of a stroke. (Rothrock Dep. at 137; Sanders Dep. at 60-61).

### c. Patrol and Jail Officer Training

The jail officers who came into contact with Smith received jailer training, on the job training, and were Georgia P.O.S.T. (peace officer standards and training) certified jailers. (SOMF ¶ 89; Lipsey Dep. at 162).

The officers did not receive medical training and did not receive training on how to rule out non drug related causes for a person's behavior. (Lipsey Dep. at 162). There was a policy, however, that stated officers were to contact medical staff if the officers observed an obvious need for medical care or if the detainee asked for medical assistance. (Lipsey Dep. at 190). Another policy was that officers were required to ask medical questions as part of the intake process. (Lipsey Dep. at 177). The information was then passed to the medical staff, who would then review

the information and evaluate the detainees.  (Lipsey Dep. at 177; Catanzarita Dep. at 21).   Jail policies are documented in the Tift County Detention Center's Policies and Procedures Manual.  (Lipsey Aff. ¶ 6).   The jail officers were instructed to read the manual and to follow the policies and procedures to the best of their abilities. (Lipsey Aff. ¶ 7).  Through their on the job training, the officers became familiar with the policies, including the booking process (Lipsey Aff. ¶ 9).

Patrol officers received additional instruction from the County Sheriff's Office. General Order 222 instructed patrol officers to realize that "other circumstances may cause a person to exhibit signs and symptoms of intoxication, such as . . . head injuries; other medical problems."  The order stated that the possibility of a medical condition must be explored so that a person who is ill may receive medical treatment "and not suffer further aggravation by being incarcerated." (Lipsey Dep. Ex. N).

### III.   SUMMARY JUDGMENT STANDARD

Summary judgment must be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material facts and that the movant is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(c).   In ruling on a defendant's motion for summary judgment, the court takes the facts in the light most favorable to the plaintiff. Stanley v. City of Dalton, 219 F.3d 1280, 1287 (11th Cir. 2000).  The court may not, however, make credibility determinations or weigh the evidence.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).

The initial burden lies on the movant to demonstrate that the nonmovant lacks evidence to support an essential element of its claim.  <u>Lowe v. Aldridge</u>, 958 F.2d 1565, 1569 (11th Cir. 1992).  The burden then shifts to the nonmovant, who must come forward with some evidence that would allow a jury to find in his favor, even if the parties dispute that evidence.  <u>Id.</u>  If the evidence that the nonmovant presents, however, is "not significantly probative" or "merely colorable," then summary judgment may be granted.  <u>Liberty Lobby</u>, 477 U.S. at  249.

## IV.    FEDERAL LAW CLAIMS

The Defendants argue summary judgment is warranted on Plaintiff's federal claims because (1) Plaintiffs' claims against the Sheriff are barred by Eleventh Amendment immunity; (2) Plaintiffs cannot show facts establishing that a custom, or policy of the Defendants or the Defendants' failure to train caused a constitutional violation; (3) Plaintiffs cannot show a violation of Smith's constitutional rights; and (4) Plaintiffs cannot show that the Defendants' actions caused Smith's injuries.

The Court first addresses the Eleventh Amendment issue, and then grants summary judgment in favor of the Defendants because there is a lack of record evidence showing that a custom or policy of Defendants or the Defendants' failure to train caused a constitutional violation.

### a.  Eleventh Amendment Immunity

The Plaintiffs sue the Sheriff in his official capacity, arguing that he failed to train his deputies and had defective policies.  Plaintiffs argue these actions caused Smith's constitutional deprivations.  "A suit against an official in his or her official

capacity is not a suit against the official but is rather a suit against the official's office."  Smith v. Allen, 502 F.3d 1255, 1275 (11th Cir. 2007) (citation and quotations omitted).  A suit for money damages against a state officer in his official capacity is therefore a suit against the state and is barred by the Eleventh Amendment.  Jackson v. Georgia Dept. of Transp., 16 F.3d 1573, 1575 (11th Cir. 1994). Further, the Eleventh Amendment provides immunity to defendants "acting as an 'arm of the state,' which includes agents and instrumentalities of the state."  Manders v. Lee, 338 F.3d 1304, 1308 (11th Cir. 2003) (en banc).  The Defendants argue that the Sheriff operates as an "arm of the state" and is entitled to immunity under the Eleventh Amendment.

In the Eleventh Circuit, the arm of the state determination must be made on a function-by-function basis.[4]  Abusaid v. Hillsborough County Bd. of County Com'rs, 405 F.3d 1298, 1304 (11th Cir. 2005).  "The Northern District of Georgia's decision in [Dukes v. Georgia, 428 F. Supp. 2d 1298 (N.D. Ga. 2006)], as well as the Eleventh Circuit's decision in Manders suggest that in providing medical care for jail inmates, a sheriff acts as an arm of the county."  Hooks v. Brogdon, 2007 WL 2904009, No. 7:05-cv-42, at *2 (M.D. Ga. Sept. 29, 2007).

The Court chooses not to decide whether the Sheriff acted as an arm of the state.  Even if the Sheriff is not entitled to Eleventh Amendment immunity, the Defendants are entitled to summary judgment because the plaintiffs have not

---

[4]  The Eleventh Circuit examines four factors to determine whether an entity is an arm of the State: (1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity.  Manders v. Lee, 338 F.3d at 1309.

created a genuine issue of fact that a custom or policy of the Defendants' or a failure to train caused Smith's constitutional deprivation.

Accordingly, the Court proceeds to analyze Plaintiffs' suit against the Sheriff as though he is an arm of the County.  A suit against a county officer in his official capacity is a suit against the county the officer represents.  Busby v. City of Orlando, 931 F.2d 764, 776 (11th Cir. 1991) (per curiam).

### b.  Municipal Liability Legal Standard

Section 1983 provides a cause of action for persons whose rights under the United States Constitution have been violated under color of state law.  "To establish a claim under [Section 1983], a plaintiff must prove (1) a violation of a constitutional right, and (2) that the alleged violation was committed by a person acting under color of state law."  Holmes v. Crosby, 418 F.3d 1256, 1258 (11th Cir. 2005).  Plaintiffs seek to hold the Defendants liable because they failed to adequately train patrol officers and jailers.  Plaintiffs also seek to hold Defendants liable because of their policies or customs.

"Supervisory officials are not liable under section 1983 on the basis of respondeat superior or vicarious liability."  Belcher v. City of Foley, Ala., 30 F.3d 1390, 1396-97 (11th Cir. 1994).  A supervisor will only be liable under § 1983 when he personally participates in the alleged constitutional violation or when the there is a causal connection between the actions of the supervising officer and the alleged constitutional violation.  Braddy v. Fla. Dep't of Labor & Empl. Sec., 133 F.3d 797, 802 (11th Cir. 1998).  Likewise, "in order to recover against a municipality, a plaintiff

must establish that the alleged [constitutional deprivation] occurred pursuant to a custom or policy of the municipality." Busby, 931 F.2d at 776.  Plaintiffs have not alleged that the Sheriff personally participated in any of the alleged violations of Smith's constitutional rights.  The court will solely evaluate the Defendants' actions in the context of a failure to train or implement policy.

### c.  Failure to Train

Plaintiffs seek to impose liability on the Defendants under the theory that the County and the Sheriff did not train patrol or jail officers to rule out medical explanations for Smith's symptoms or to recognize that Smith's symptoms were consistent with stroke symptoms.  According to Plaintiffs, the patrol and jail officers should have been trained to recognize Smith's immediate need for medical care despite the fact that he did not exhibit symptoms of emergency conditions.

"A failure to adequately train municipal employees constitutes an actionable policy or custom for § 1983 purposes only where the failure to train amounts to deliberate indifference to the rights of persons with whom the [employees] come into contact." Cook v. Sheriff of Monroe County, Fla., 402 F.3d 1092, 1116 (11th Cir. 2005) (citation and quotations omitted).  There must be "some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998).  The need for more or different training must be "so obvious" that it is "likely to result in the violation of constitutional rights . . . ." City of Canton, Ohio v. Harris, 489 U.S. 378, 390, 190 S.

Ct. 1197, 103 L.ed.2d 412 (1989).  It must be morally certain to the Defendants that the officers' training program was insufficient.  Id. at 390 n. 10.

Plaintiffs have not produced any evidence that prior incidents gave the County or the Sheriff notice of the need for specific medical training.  Instead, they rely on the experience of Smith, statistical data, the Sheriff's and Captain Jerry Randall Lipsey's ("Lipsey") testimony, and their expert's statements about the need for more training.

Importantly, Plaintiffs concede or otherwise do not dispute certain facts. They concede that the Sheriff's policy stated that officers must realize that non-alcohol related causes may produce the same signs or symptoms of intoxication. The Plaintiffs do not dispute that Smith did not exhibit emergency symptoms on arrival or indicate that he was experiencing an emergency.  He responded to questions, walked, and did not ask for medical assistance. They also do not dispute that the officers were instructed to contact the jail nurse or contact emergency medical technicians to examine the detainee if the officers thought the detainee had an obvious need for medical care.  Finally, they do not dispute that the officers were instructed to conduct the intake process and as part of the process, they were instructed to gather basic medical information from a detainee.

The Plaintiffs have argued that the need to train officers to identify the symptoms of stroke is obvious.  They point out that suffering a stroke is the third leading cause of death in the United States and that every forty seconds someone suffers a stroke.  Their law enforcement expert testified that patrol officers on duty

will encounter "people who they believe initially are operating under the influence, but it was a medical problem." (Tucker Dep. Vol. I at 59). Tift County's correctional healthcare provider recommends that detention officers receive training beyond first aid and CPR. Given the prevalence of strokes, the Plaintiffs argue that the need to train officers to recognize stroke symptoms is obvious.

It is difficult for a plaintiff to succeed on a failure to train claim based on a single incident. The Fifth Circuit has stated that it can "reasonably expect—if the need for training in this area was so obvious and the failure to train was so likely to result in the violation of constitutional rights"—that the [Plaintiffs] would be able to identify other instances of harm arising from the failure to train." Conner v. Travis County, 209 F.3d 794, 797 (5th Cir. 2000). Generally, circuit courts have rejected deliberate indifference claims based on single incidents. See, e.g., Id.; Meritt v. County of Los Angeles, 875 F.2d 765, 770 (9th Cir. 1989) ("Mere proof of a single incident of errant behavior is a clearly insufficient basis for imposing liability on the county."). Nevertheless, the Supreme Court has hypothesized, and therefore has left the door open, that in a narrow range of circumstances a failure to train claim may be based on a single incident. Gold, 151 F.3d at 1351-52. Plaintiffs have not met this high burden.

In Conner, the court found the plaintiffs failed to meet their summary judgment burden when the expert testified, without supporting data, that detainees with stroke symptoms would present themselves so frequently that the officers should be trained to recognize them. Conner, 209 F.3d at 798. In this case,

Plaintiffs' expert does not testify to the prevalence of stroke occurrence.  He stated that it is "obvious to an officer. . . that they're going to find people who they believe initially were operating under the influence, but it was a medical problem . . . ." (Tucker Dep. Vol. I at 59).  Nevertheless, he conceded that the vast majority of drivers that an officer encounters are going to be under the influence of drugs or alcohol, rather than be suffering from a stroke.  (Tucker Dep. Vol. I at 60).  He also offered no testimony showing that other departments have specific training policies different from those of the Defendants' and has not described the nature of additional training.  While he opines that the training policies were inadequate in that the officers should have been trained to recognize that a person may have a medical condition even though the person is unaware of the condition, this inadequacy does not rise to the level of constitutional infirmity.  The Supreme Court has stated that a sheriff is only required to adequately train its officers "to respond properly to the usual and recurring situations which they must deal."  <u>City of Canton</u>, 439 U.S. at 391.  Here, there is no evidence that the Defendants were on notice that patrol and jail officers would encounter stroke victims or persons who do not exhibit physical symptoms of trauma so frequently that they would be considered "usual and recurring situations."

As for Plaintiffs' statistical evidence, no witness refers to the prevalence of stroke or to incidents where a detainee suffered a stroke or another medical condition and received delayed medical treatment.  The facts that stroke is the third leading cause of death in the United States and that a person suffers a stroke every

forty seconds are insufficient to show that the that the need to train patrol and jail officers on the symptoms of stroke was obvious.

The Sheriff's and Lipsey's testimonies do not indicate that either was on notice that there was a need for additional medical training.   In contrast, the testimonies indicate that they understood the current policies to be adequate.   It is undisputed that the patrol officers were instructed through the Sheriff's policy to understand that certain behaviors may be caused by medical conditions, not drug use.   The jail officers were also instructed to follow intake medical screening procedures and ask standard questions to a detainee about his medical condition. Notably, this is not a case where there was absolutely no relevant instruction provided.   In such a case, courts may be willing to find that a need for training was plainly obvious.   Here, however, the patrol and jail officers were provided instructions and directives on conducting medical screening.

The Court does not doubt that the Defendants' policies for providing medical training to patrol and jail officers may be inadequate, but based on the facts presented, it cannot find that the Defendants' actions were the result of deliberate indifference.   The Court accordingly grants the Defendants summary judgment on Plaintiffs' § 1983 claim to the extent it is based on a failure to train.

### d. Customs and Policies

To impose § 1983 liability on municipality for its policies or customs a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional

right; and (3) that the policy or custom caused the violation." <u>McDowell v. Brown</u>, 392 F.3d 1283, 1289 (11th Cir. 2004).  The Court chooses to grant Defendants summary judgment on the second prong of the three prong custom or policy test.

A custom is "a practice that is so settled and permanent that it takes on the force of law." <u>Sewell v. Town of Lake Hamilton</u>, 117 F.3d 488, 489 (11th Cir. 1997). In order for a plaintiff to demonstrate a policy or custom, it is "generally necessary to show a persistent and wide-spread practice." <u>Depew v. City of St. Mary's, Ga.</u>, 787 F.2d 1496, 1499 (11th Cir. 1986)   This ensures that liability is not imposed upon an isolated incident.  Deliberate indifference is shown when a "municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." <u>Gold</u>, 1151 F.3d at 1350.  Unless a plaintiff shows that the municipality had notice of the need to supervise in a particular area, the plaintiff has not shown deliberate indifference. <u>Id.</u> at 1351.

Plaintiffs contend that there were policies or customs in place that were deliberately indifferent to Smith's constitutional rights.  They assert that there was an accepted custom where officers did not conduct a prompt and proper medical screen of individuals in custody.[5] Plaintiffs take issue with the Defendants' policy of allowing jail officers lacking medical training to conduct the initial medical screens.

---

[5] In their complaint, Plaintiffs also contend that the Sheriff actively discouraged the transfer of inmates to outside medical facilities and was aware of low staffing levels at the jail, as well as a lack of basic medical supplies and working equipment (Compl. 33, 55).  Plaintiffs have not argued these claims in response to the Defendants' summary judgment motion.  As a result, the Court will consider the claims abandoned. <u>See</u> <u>Resolution Trust Corp v. Dummar Corp.</u>, 43 F.3d 587, 599 (11th Cir. 1995) (finding that a plaintiff abandons his claim if he fails to respond to an argument or otherwise address the claim).

They also take issue with the Defendants' policy of leaving detainees in holding cells for up to twelve hours to enable the detainee to sober up.

To demonstrate that the Defendants had a custom of not conducting prompt or proper medical screens, Plaintiffs rely only on Smith's experience. Budd does not recall whether he asked Smith if he had been using drugs or had consumed alcohol; Lyles ran no background check on Smith; and Catanzarita did not complete the intake question form because Smith did not respond properly to all Catanzarita's questions. To the Court, this evidence falls far short of showing a persistent or wide-spread practice. The plaintiffs have not pointed to other occasions where prompt or proper medical screens did not occur. Moreover, this is not a case where municipal liability can be imposed in the absence of an express policy or custom because there is no evidence that Budd, Lyles, or Catanzarita had "final policymaking authority in the area of the act or decision." Cuesta v. School Bd. of Miami-Dade County, Fla., 285 F.3d 962, 968 (11th Cir. 2002) (citation omitted). Consequently, the Plaintiffs cannot survive summary judgment on the basis that the Defendants had a custom of not conducting prompt or proper medical screens.

As for Plaintiffs' remaining contentions, the Defendants concede that they had policy where initial intake questions, including those regarding medical conditions, were asked by untrained medical personnel. They also do not dispute that there is evidence in the record showing it was customary for jail officers to leave a detainee in a cell for twelve hours to sober up. Defendants argue, however,

that there is no evidence in the record showing that the policy and custom were deliberately indifferent to Smith's constitutional rights.  The Court agrees.

To establish that a custom or policy was the product of deliberate indifference to constitutional rights, there must be evidence showing the municipality had notice of a need to supervise.  Gold, 151 F.3d at 1350.  To establish notice in a context outside of a failure to train claim, the municipality must be made aware of previous constitutional deprivations caused by its policies.  McDowell, 392 F.3d at 1291.[6]  In other words, there must be evidence of prior-incidents of constitutional violations in the record.  Miller v. Bulloch County, 2009 WL 2337996, No. 608-CV-05, at *4 n. 4 (S.D. Ga. July 27, 2009).

In this case, there is no evidence in the record showing that there was a persistent inability of the jail officers to identify medical problems at the intake process without the benefit of trained medical staff; rather, the record shows that their failure to do so in Smith's case was a rare occurrence. There is also no evidence that the jail officers' custom of leaving a detainee in his cell for twelve hours resulted in previous constitutional deprivations.  At most, these policies were the product of negligence.  There is no deliberate indifference if there is a "showing of simple or even heightened negligence . . . ."  McDowell, 392 F.3d at 1291 (citation omitted).

---

[6] The Supreme Court has distinguished policies which on their face are valid from failure to train policies.  In failure to train cases, the risk that a constitutional deprivation may occur may be obvious, but in other cases involving for example, decisions not to hire, the risk of a constitutional deprivation "is not 'obvious' in the abstract."  Board of County Com'rs of Bryan County, Okl. V. Brown, 520 U.S. 397, 117 S. Ct. 1382, 1391, 137 L.Ed.2d 626 (1997).

Plaintiffs rely primarily on Howard v. City of Columbus, 521 S.E.2d 51 (2000), which is not binding on this Court.  In that case, the court found that the jail's policy was to have medical screenings conducted by a jail officer with no medical training. Howard, 521 S.E.2d at 64.  The plaintiff was a diabetic, but the medical screening did not document his condition.  Id. at 59.  After being incarcerated for few months, the plaintiff's condition worsened.  He made repeated requests to see a nurse, but she refused to see him.  Having received no treatment, the plaintiff died. Id. The court imposed liability on the municipality in part because the plaintiffs had provided evidence that ten to thirteen inmates had died from diabetes while in custody.  Id. at 64.

Plaintiffs have not presented similar evidence that was presented in Howard. While a series of prior deaths put the defendants in Howard on notice that their policies were defective, the Plaintiffs in this case point to no prior-incident evidence. This failing is fatal to their claims seeking to impose liability on the Defendants for their policies and customs.

Thus, without any factual support that suggests the Defendants' were on notice that their policy or custom were defective, the Plaintiffs cannot survive summary judgment on the basis that the Defendants' had policies or customs that caused Smith's constitutional violations.  The Court grants summary judgment to the Defendants on Plaintiffs' § 1983 claim.

### e.  Attorneys' Fees: 42 U.S.C. § 1988

In civil rights cases, including cases brought pursuant to 42 U.S.C. § 1983, a reasonable attorney's fee may be awarded to the prevailing party.  42 U.S.C. § 1988(b).  In light of the Court's decision to grant summary judgment to the Defendants on Plaintiffs' § 1983 claim, the Court finds that Plaintiffs are not prevailing parties and are therefore not entitled to an attorneys' fees award.

## V.   STATE LAW WRONGFUL DEATH CLAIM

Plaintiffs seek to hold the Defendants liable for Smith's death under Georgia's wrongful death statute, § 51-4-1 *et seq.*  The Defendants are entitled to summary judgment on this state law claim because of the doctrine of sovereign immunity.  First, "[a] county is not liable to suit for any cause of action unless made so by statute."  O.C.G.A. § 36-1-4.  Plaintiffs have shown no evidence that this immunity has been waived by an act of the Georgia General Assembly. The Georgia Tort Claims Act expressly exempts counties from the waiver of sovereign immunity. Gilbert v. Richardson, 452 S.E.2d 476, 478 (1994).  The County is accordingly entitled to summary judgment as to the Plaintiffs' wrongful death claim.

Second, the Sheriff is entitled to sovereign immunity on the state law claims brought against him in his official capacity.  "[T]he county sheriff in his official capacity is immune from tort liability in performing an official function and may be liable only to the extent that the county has waived sovereign immunity by statute." Howard, 521 S.E.2d at 65.  Because the County has not waived sovereign

immunity, the Sheriff, in his official capacity, is entitled to summary judgment on the Plaintiffs' state law claims.

## VI.    CONCLUSION

For the explained reasons, the Defendants' motion for summary judgment is granted.  Plaintiffs' request for leave to file an insurance policy is denied as moot.

**SO ORDERED**, this the 29th day of March, 2010.

*s/   Hugh Lawson*
**HUGH LAWSON, SENIOR JUDGE**

lmc